Good morning, Your Honors. May it please the Court, my name is Mark Colville. I'm representing Ms. Bustamante this morning in the Social Security Disability Appeal. I will keep track of my own time, but I would like to try to reserve two minutes of my time for rebuttal. The heart of this case, in my opinion, so let me get right to that part, is the agency referred Ms. Bustamante to their expert, their examining psychiatrist. The examining psychiatrist referred Ms. Bustamante's capabilities. The agency's vocational expert said that those limitations would preclude the ability to sustain work. So two of the agency's own experts lead to a conclusion of disability in this case. I believe that under the facts of this case, that should end the matter, and this matter should be remanded for determination of benefits based on the agency's own evidence. Now, the administrative law judge rejected the opinion of the agency's own examining psychiatrist for three reasons. One, the psychiatrist said there were no cognitive benefits, and I have a Rule 28J letter that gives you a case that says cognitive benefits don't have anything to do with a person who is disabled from emotional problems, and of course here the diagnosis was major depressive disorder. So that is not a good reason. But here is where I think the agency went wrong. There was this extreme focus on this mentally disabled woman's lack of mental health treatment. And I will concede that that is true. She went to Teros, which is the indigent mental health agency in Arizona. Didn't do it for very long. But when she was there, they made some very significant findings. They said the woman was literally incoherent. Ginsburg. What? I mean, there is some case law. Waxman. Judge? Ginsburg. Even in the mental health area. Waxman. Excuse me. You asked us to speak up. I have some tinnitus, so you're going to have to compete with my tinnitus. Ginsburg. My question is, the ALJ seemed to rely on her noncompliance or nontreatment as going to her credibility. And that seems somewhat questionable. But isn't there an underlying policy determination that says, essentially, whether somebody is disabled is really whether they are disabled despite whatever nonreasonable treatment they could have. Is there a finding, essentially, that if she had gotten the treatment, she would have been able to work? So, you know, not because she's lying, but because why are we going to give any benefits to somebody who doesn't work when they could work if they just took the medication? Waxman. Well, that was sort of the lecture that the ALJ was giving this woman at the time of the hearing. Ginsburg. I'm asking what the case law is about that, if there is any. Waxman. The best case is probably one of my own cases, Burns, B-Y-R-N-E-S, v. Shalala back in, I think it was in 1995. And they talked in that case, it's in my briefs, and they talked in that case about the fact that when you're looking at a person's noncompliance, you have to look at the person's psychological and social situation. And, of course, that's exactly what we have here. This woman is a mess. O'Reilly. Is there anything in the record, though, that supports the fact that whatever mental disability she has, including depression, is the cause of the reason that she's noncompliant? Waxman. I don't think there's a direct opinion from anyone that says that. But the recent Garrison case, for example, talked about you look at the overall facts of the case in looking at whether a person is willfully noncompliant. But, again, here we have some pretty good limited insight and judgment. And that same finding appears in the Teros records. And in my reply brief, I cite — O'Reilly. That doesn't say very much. I mean, there are a lot of people walking around us who don't have depression, have lots of really bad judgment. But that doesn't — Waxman. Well, I'll grant you that. But I think the other one is the insight. Insight in psychiatric parlance means are you aware of your problem? Are you aware of the fact that you need treatment? And I cite a psychiatric text in my reply brief that addresses that. But here's the problem I have with this kind of rationale. It assumes some sort of willful behavior. And it is the nature of people who are suffering from major depressive disorder to have a very hard time taking the initiative — O'Reilly. She didn't just fail to show up for appointments, for example, at Teros. She actually told Teros to close the file. That's an affirmative act on her part. Waxman. Yes. She had stopped — she had missed two appointments before that. You know, and she said in the record — she said, you know, I've tried these various medications and they're not working for me. She just gave up. She's hopeless. And she's hopeless because she's suffering from a major depressive disorder. It is — it is taken out of context to call it noncompliance. Noncompliance implies, like with a diabetic — Counselor, does it make a difference here that on her initial application that she listed her principal disability as the heart, the heart problems, the diabetes? No, I don't. I don't expect a — It just looks a little bit like a moving — like a moving target. The heart then no longer becomes a major problem. She looks like she's had a pretty good recovery from that. She did. The diabetes is not particularly under control. She just doesn't take her medication. And all of a sudden we've got the fibro neuralgia or the fibro — whatever it was, the fibro whatever. You know what I'm talking about. Fibro will do. And I mean, it just — it just looks like the — like the diagnosis or the complaint sort of — sort of keep morphing. Well, the Beneke case sort of addresses that a little bit in terms of fibromyalgia because the Beneke case talks about a lot of times that diagnosis comes in later after they've ruled out all of these other things. But I want to be more direct in my answer. I don't expect a deeply mentally impaired person to do a very good job of filling out their application in terms of pointing out — But also, didn't — wasn't — I mean, the most clear manifestation of depression was  Yes. Yeah. Yes. In February of 2009, she tried to kill herself. She was in the hospital three days. That was after that. Yes. And then after that, she went to terrorists, and that's where they said she — she was virtually incoherent. So that, I think, is the biggest mistake that we've made here — that's been made here. So do you understand the ALJ's opinion to be that she didn't have depression or as severe as she said she said or something else? No. I think the ALJ, frankly, was making a mistake that I see a lot here. I'm going to make my answer quick because I want to reserve those two minutes. The ALJ was acting as their own expert witness. The ALJ was saying, you know, well, if she had treatment, she wouldn't have this problem, and so, therefore, she's not disabled. What we see in these cases, quite frankly, is a person — I'm giving my own opinion here — a person who's committing passive suicide. She just has given up. She's just not taking her medication. She just doesn't give a darn anymore. My time — may I reserve my remaining time? Okay. You can reserve your time. Thank you.  May it please the Court. Good morning. Sarah Van Arsdale Berry. I'm appearing on behalf of the Acting Commissioner of Social Security. Here we have a case where the claimant, Ms. Bustamante, alleges severe restrictions in her ability to function, but they're not borne out by the record. First, with regard to her mental health, her examination showed, most of the time, at most she did not seek any mental health treatment at all before she went to her consultative examination in September of 2008. And, yes, while she did have a significant event in February of 2009, the overdose mentioned previously, the mental health treatment records thereafter showed a rather significant and steady recovery, to the point that by April and May of 2009, the objective mental health findings were that her concentration was fair, her memory was intact, her insight and her judgment were good, her perception was normal, and she made logical associations. Further — Those are mainly cognitive things. I agree that those are objective findings that would be considered by any psychologist, as I understand they're fairly standard objective findings to make, whether they relate to whatever type of mental health disorder that you might have. I don't really understand what you're saying. To the point that I think they address her depression, and so if they're cognitive findings, they address whatever cognitive limitations she may have. But to the larger point, with respect to counsel's argument that the error that occurred in this case was that the ALJ didn't give Dr. Steingard's opinion enough weight, I think really what we are looking at is the extent to which Ms. Bustamante had difficulties maintaining concentration, persistence and pace. That was the overall finding that she made, and so I think that's really where we're focused here. So I think what we're left with is, did the ALJ reasonably find, after not just looking at the consultative examination physician, the ALJ is charged with looking at the record as a whole, not just one particular examiner's findings, but the entire record, which would include the objective psychological findings mentioned above in 2009, but which would also include Dr. Steingard's own findings, which in that examination she herself found that normal motor level, concrete stream of thought. She also administered a mini mental status exam in which Ms. Bustamante scored 27 out of 30. And so if the question here is, you know, how — What is a mental status exam? Your Honor, it's my understanding that a mini mental status exam is to measure a person's ability to think and — Right. So these are all cognitive issues and they don't go to the depression. Didn't we have — wasn't there a very recent Ninth Circuit opinion essentially making that distinction between cognitive impairment and the impact of severe depression? There can be a cognitive impact from depression, but it's not the whole of it and it's not what's necessarily the impairing. I agree with that, Your Honor, and I agree — So why are we going through all this? Well, I think the reason why we're focused on all of this is because at the end of the day, what Dr. Steingard found that her depression limited her in with regard to work-related limitations, which is ultimately what we're considering here, is that it was the concentration, persistence and pace that were her difficulty, that she was going to have — Concentration, persistence and pace are not what you were just going through. You were going through logical thought and memory and so on. That is true. I also mentioned satisfactory attention span, which was noted in several examinations, one of them being Dr. Steingard's. The reason why I mentioned the mini mental status exam is because if it's measuring a person's ability to think, part of what they're doing is measuring attention and concentration. So I do think that that score of 27 out of 30 was appropriate for the ALJ to have relied upon. So what we're left with considering is whether the ALJ's conclusion in discounting Dr. Steingard's consultative opinion was reasonable under the substantial evidence standard in light of what I've highlighted, but also with respect to the state agency psychologist who reviewed Ms. Bustamante's records. That particular opinion was mirrored in the ALJ's RFC finding. The ALJ did not find she had no limitations, but rather that she had mild limitations in concentration, persistence and pace. And that's reflected in what the state agency psychologist found. It was appropriate for the ALJ to have relied upon the state agency psychologist in this particular case because as Ninth Circuit — The state psychologist never met her, A. That is correct. The state agency psychologist would review her medical records on file. Okay. And the medical records on file, he could see that she didn't — wasn't compliant with treatment. What else could he tell about her depression? He would have seen that noncompliance — excuse me, it was a woman who was the psychologist. Dr. Newman would have also reviewed Dr. Steingard's report. Those findings are mentioned in her opinion as well. So that evidence all would have been considered. But when the ALJ is charged with reviewing the state agency psychologist's opinion, she's charged with considering it as against the record as a whole. Do we have mental health experts other than Steingard and Newman in this record? No, Your Honor. Those are the only — Steingard saw her once. Correct. Newman didn't see her at all. Correct. And neither one of them was prescribing any medication for her. That is also correct, Your Honor. Yes. There were people who were prescribing medication for her and therefore thought she was sick enough to need the medication. She didn't take it, but it was prescribed for her. Yes. That was what I wanted to clarify with respect to that opinion. She was getting some treatment from other providers, but they did not issue an opinion regarding her limitations here. But they obviously had the opinion that she was — had a serious enough problem to be subject to medication. I agree with that. They had that opinion. They prescribed medication. She did not follow up. She did not take it. They — These were professionals at Taros or were they someplace else? Was this a personal position or were these people who specialized in mental health? Your Honor, I believe it was both at Taros, the mental health clinic, but then also there's a few references while she was in the hospital in early 2009. She didn't have a personal physician who was prescribing Prozac or something else. I don't believe so. I believe in the record earlier in time, such as in 2007, I think her primary care provider may have prescribed her medication that she did not fill, psychiatric medication that she did not fill. But do you agree that the administrative law judge's opinion hinged — I mean, if you pulled out the noncompliance, his opinion wouldn't stand itself, because it was very dependent on the noncompliance, his conclusion. Your Honor, I agree that that particular concept is running throughout the ALJ's decision here, yes. So because she — I mean, she had a suicide attempt. She had people who diagnosed her with serious depression who prescribed medication for her for serious depression. She had an examining doctor who said she had serious depression. And so everything really hinged on this noncompliance. I disagree that everything hinged on the noncompliance. I do think the objective psychological findings need to be considered, and I — But they were primarily cognitive, the ones that said that she wasn't impaired. But I agree, but I think that that is the crux of the matter in this case, because that's what Dr. Steingart ultimately found limited her ability to work. So in that sense, it's — Well, not only in part, but other things. Persistence, pace, i.e., ability to get up in the morning and do what she was supposed to do. Yes. Yes, Your Honor. So if the question is how was her mental health evaluated, I do think that's significant. But in this particular case, unlike the cases — So what — so what — and ALJ said it was going to her credibility. It doesn't go to her credibility, in fact. Yes. I do think it goes to her credibility, because this is not a case where we have a mental health disorder that is limiting somebody's ability to seek treatment. I disagree with counsel's characterization that that is this case. But that's a different question. I mean, it's — there's really not a credibility question as to whether she had a serious depression. I mean, she had a — she had a suicide attempt. She had people prescribing medication for her. She had people diagnosing her with a serious depression. So there's not really an issue as to whether she did have it. The question is that she didn't comply with her medication. And maybe that's an independent problem, because we're not going to give benefits to people who won't get — take their medication. But that — what does it have to do with credibility? Your Honor, I see that I'm almost out of time. May I answer? I have a question as well, at some point. To address that point, it does go to credibility in the sense that she has claims of significant limitations, and the — and her actions undermine whatever — whatever claims that she may have had. And so in that sense, I think that they are directly related. I also think that there's a — If a child is in terrible pain, saying they're in terrible pain, and they could take medication and they wouldn't be in terrible pain, you do have reason to doubt whether they're really in terrible pain, right? Unless there's a money issue or something. But why is that necessarily true of depression? Well, this is where I think the other observations that were made and the other findings that were made by the people at Taros and also by Dr. Steiner, this is where I think they come into play. Because at the end of the day, yes, she has a diagnosis of depression, but the question is, does that diagnosis render her unable to perform any work-related activities such that she would be entitled to disability under the Act? And so in that sense, I think they do intertwine, and that's how they would tie back to her credibility where — an additional thing I wanted to mention is that with at least one of the records where they made findings that were relatively to imply that, yes, she has a diagnosis, but she was also doing pretty well regardless. Okay. If I may, Judge Bybee asked your opposing counsel a question at the beginning about whether there was anything in the record to suggest that the mental illness that this woman suffers from, and I think there's no dispute that she has all kinds of mental disabilities here, that that was the cause of her failure to follow the doctor's orders, follow — to eat better, all these things that she wasn't doing. Are you aware of anything in the record that makes a connection between those two? I am aware of several things in the record that would contradict his claim that that is what was causing her to be noncompliant. Right. So first, I think her affirmative step of closing her file is a significant piece of evidence that needs to be considered. That is not simply her failing to follow up or attend appointments because she was unable to do so on a particular day. That is her taking an affirmative step to close whatever treatment plan that her mental health center had put in place for her and that they expected her to follow. Did she ever take medication? She did say that she had taken it and it didn't help. What's the record about whether she took it? Your Honor, to be fair, that's very unclear as to when precisely she took it. I believe she took it for a short amount of time in 2009. She may have taken it briefly in a prior year, but it's quite unclear. I know Dr. Steingard noted she was quite vague in her psychiatric history and it's difficult to follow when she may have been on it. The record I noted before where the provider noted that she wasn't on medication and she still was doing relatively well, I think that's a more direct correlation as to how she was doing without her medication. The other thing that I would note is that in many of the cases that talk about the fact that a particular mental disorder may prevent someone from seeking treatment, number one, it is a significant, serious disorder, oftentimes, you know, some level of psychosis, schizophrenia, bipolar disorder. I don't know, while depression is significant, I don't know that she had it in this case to that degree, number one. And number two, I think the fact that she didn't just fail to attend certain mental health appointments, but that she also had a pretty consistent record of not complying with all kinds of recommendations that her physicians imposed, whether you're talking about recommendations to exercise more, be more active, follow her diet, take her diabetes medication, follow her cardiologist recommendations, she failed to go to physical therapy, the physical therapist eventually closed her file, I think that all has to be taken into context if her assertion now is, well, I couldn't do any of those things because my mental health disorder was so severe I was unable to. Thank you very much. And we'll give you whatever time we have left, which is apparently a minute and 28 seconds. Well, you gave her extra time. Judge Berzon, the case you're looking for on the distinction between cognitive and emotional impairments is GANIM, G-A, excuse me, G-A-N-I-M-7-6-3-F-3-1-1-5-4. There is at least one case in this Court is there not applying the ‑‑ Judge, again, please. There is at least one case in this Court is there not applying the credibility rationale to failure to take medication for depression, is that right, or for mental health purposes? Well, I think I was alluding to the Burns case before. That wasn't directly about mental health. But I thought there was one about mental health, a relatively recent one. Brewis, maybe, 2012? Well, Brewis is the one that says that it's ‑‑ Brewis supports my position. Right. Brewis says that the woman's failure to do that is, in the context of a mental impairment, entirely consistent. The other thing I want to point out is you can't rewrite the evidence. My counsel, whom I respect, said that the Steingard evaluation was based upon cognitive impairments. Here's what Dr. Steingard said, ER366. She did not appear cognitively impaired. Quote, I think she's going to have difficulty maintaining concentration due to depression primarily. I think she's going to need a lot of extra supervision on the job. And that's what the vocational experts said would preclude sustained work. I know I'm a little bit over. I just want to give you one more citation because the ALJ relied heavily on these non‑examining state agency doctors. And there are a lot of cases that I cite in my briefs, but the most recent is the Garrison case. It is 759F3995. And that is exactly what this court said was improper under the circumstances of that case, although that case did involve a treating physician as opposed to an examining physician. But I don't think that's significant. Are there any questions? Okay. Thank you very much. Thank you. Thank both of you for a helpful argument. The case of Bustamante v. Carolyn Colvin is submitted. We will go on to new news v. Commissioner for Tribal Revenue. We will then take a short break.
judges: Berzon, Bybee, Owens